# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00716-CR

**Harvey Richard Groff, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
### NO. 12,598, HONORABLE TERRY L. FLENNIKEN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant guilty of sexually assaulting his daughter, M.G., by penetrating her sexual organ with his finger when she was under seventeen years of age.[1]  In two issues, appellant contends that the trial court erred by failing to require the State to properly elect the specific incident on which it relied to support his conviction for sexual assault and then by failing to instruct the jury regarding the election that was made.  The State concedes error but urges that appellant was not harmed.  We will affirm the judgment of conviction.

---

[1]  The indictment contained four counts.  Counts one and three alleged that on or about June 1, 2002, appellant intentionally and knowingly penetrated M.G.'s sexual organ with his finger (count one) and his tongue (count three).  *See* Tex. Penal Code Ann. § 22.011(a)(2)(A) (West Supp. 2008).  Count two alleged that on or about the same date, appellant intentionally and knowingly penetrated M.G.'s mouth with his sexual organ.  *See id*. § 22.011(a)(2)(B).  Count four alleged that on or about June 11, 2006, appellant touched the breast of his other minor daughter, B.G., with the intent to arouse or gratify his sexual desire.  *See id*. § 21.11(a)(1) (West 2003).  The jury convicted appellant on count one, but it returned verdicts of not guilty on the other three counts.  The jury assessed appellant's punishment at sixteen years' imprisonment and a $10,000 fine.

## EVIDENCE

M.G., who was nineteen years old at the time of the trial, testified that appellant first sexually assaulted her in the summer of 2001, when she was twelve and the family was living in Williamson County. She testified that appellant entered the bathroom while she was bathing and took her from the tub. He then felt her breasts, penetrated her vagina with his fingers, and pressed his mouth against her vagina. M.G. testified that the next abusive incident took place after the family moved to Bastrop County in 2002:

> A. I don't remember what started it up again. . . . I don't remember anything happening if it did when I was 13 but I definitely remember when I was 14 because I just remember yelling at him and saying, "I'm 14, you're sick, why are you doing this?" He could have done it when I was 13, I just don't remember. . . .
>
> . . .
>
> A. . . . In these sessions I guess or sooner or later he called them punishments, he—he would make me take my clothes off and then he—and then he would take his clothes off and he—he said things like you better try to like it or you better pretend to like it but you better put a good effort into it and—or—or you're not leaving. And things that would happen would be he—he would put his fingers in my vagina again, he would make me go down and put my mouth around his penis and he would penetrate his lips on my vagina as well. He would touch my boobs. He would—he would touch them with his hands, my boobs or my breasts—
>
> . . .
>
> Q. . . . How long did these sessions as you call them, what was the duration? How long would it last?
>
> A. From the time I was 12 to about 17, so I guess five years.
>
> Q. Okay. Let's talk about this—a—let's just pick a specific one. How long did this punishment session last?
>
> A. I would want to say half an hour to an hour. It'd just depend. . . .

. . .

A.  They mainly happened in his bedroom, my mom's and dad's bedroom or in the workshop.  There was some occasions where he would wake me up in the middle of the night and take me into the living room.

. . .

Q.  How many times, [M.G.], do you—as best you can recall, from the time that you moved to the house in Smithville until June 17th of 2006, how many times did your father do this to you?

A.  Too many to count.

Q.  Did it happen once a month?

A.  At least, I would have to say.

Q.  So in your mind more than once a month?

A.  Most likely.

. . .

Q.  So if you had said close to 50 would that probably be accurate or—

A.  Yes, ma'am.

Q.  —could it even be more than that?

A.  It could.

During cross-examination by defense counsel, M.G. testified:

Q.  . . . I think you said that there was over 50 punishments during the course of from—I believe the question was from 2001 to 2006; is that right?

A.  Yes, sir.

. . .

3

Q. You also indicated that the punishments involved basically the same thing. That you would have to take your clothes off?

A. Yes, sir.

Q. And that he would touch your vagina?

A. Yes, sir.

Q. Touch your boobs?

A. Yes, sir.

Q. And make you touch his penis; is that correct?

A. Yes, sir.

Q. And did this happen every time?

A. Yes, sir.

Q. Okay. Every 50 times—all 50 times this is part of the whole routine. You take off your clothes first?

A. Yes, sir.

Q. And then he touches your vagina?

A. Either—it didn't necessarily go in step by step by step but—like that, but usually, yes, sir, or I would have to touch his penis.

. . .

Q. All right. When was the first incident you remember in Smithville of your dad administering these types of punishments?

A. I think I—for some reason I don't remember the next time it—like the very next time it happened. I don't understand why I don't remember that. I just remember some incidents. But I just remember them happening frequently. And the only reason why I remember them picking up again when I was 14 is because I just remember yelling at him, "I'm 14, what are you doing?" And I don't know why. I just—I don't remember why it picked up again or when.

4

. . .

Q. Then he would either, in no particular order, touch your breasts, touch your vagina, penetrate your vagina with his fingers and then ask you to perform oral sex on him; is that correct?

A. Yes, sir.

Q. And this was every time?

A. Yes, sir.

M.G. testified that when she tried to resist appellant's attacks, "he would hit me, he would start punching my arm or my leg." She testified that appellant once gave her a black eye, and that on another occasion, he choked her until she passed out. She said that she did not tell her mother or someone else about the abuse because she "felt so confused" and feared what appellant might do to her or to the other members of the family.

M.G. testified that the last time appellant assaulted her was on June 11, 2006. Six days later, on June 17, she made her outcry to her mother and together they reported appellant's conduct to the police. M.G. acknowledged that on the day of her outcry, she did not tell her mother that she had been assaulted six days earlier. The testimony shows that M.G.'s mother told the police that the last incident had taken place one year before the outcry.

M.G. was examined by a sexual abuse nurse examiner following her outcry. The nurse testified that she observed no signs of trauma to M.G.'s genitals or to her body generally. The nurse testified that this was not inconsistent with the assaults described by M.G.

During cross-examination, M.G. testified that she had a serious boyfriend during her sophomore year in high school. For a number of reasons, her parents made her stop dating him. She

5

admitted that she blamed her father for this. M.G. also testified that a few weeks before her outcry, she learned that she had failed to pass part of the state test required for high school graduation and would have to retake it. M.G. knew that when appellant learned of this, he would not allow her to visit her relatives in California that summer as planned. She also acknowledged that she took the California trip after she made her outcry and appellant was no longer living with the family. As counsel told the trial court, "[O]ur defensive theory is based on the fact that she is making these allegations based on the fact that her parents made her break up with her boyfriend and the other instances and this gets dad out of the picture so that she can do what she wants."

## ELECTION

After the State rested, appellant asked that the State be required to elect the specific incident on which it intended to rely for a conviction. In response, the prosecutor stated, "[T]he State would elect the incident that was testified to by [M.G.] when she was 14 years old and her testimony was that she clearly remembers saying 'I'm 14, you can't do this any more.'" Appellant objected that this was not an adequate election. Defense counsel argued, "A single statement that 'I'm 14 and you can't do that any more' is not specific enough. It needs to be detailed so that it separates it from any other incident." Counsel urged that the defense was entitled to "a date, a time, an event." The objection was overruled.

The election issue came up again at the charge conference. The proposed charge included an instruction telling the jury that the State was not bound by the specific dates alleged in the indictment. Defense counsel requested that the jury be further instructed as follows: "The State has elected to proceed on the incident when [M.G.] made the statement, 'I'm 14 years of age,

6

you can't do this any more.'" This requested instruction was denied, and the court's jury charge contained no reference to the State's election. The charge did include an instruction that "other acts [by appellant] other than the offenses alleged against him in the indictment" were to be considered "only for the purpose of proof of motive, opportunity, intent, preparation, plan or knowledge."

During jury argument, the prosecutor told the jurors that counts one, two, and three, alleging the sexual assault of M.G., "apply to the incident that occurred when [M.G.] testified that she responded to the defendant's molestations by saying, 'I'm 14, you can't do that any more.' You'll remember her testimony in that regard. That is the offense date that we're focused on." Defense counsel also mentioned the State's election during argument, saying, "They've elected the one time that [M.G.] said 'I'm 14, you can't do this any more.' Okay? That's the only time you are here to consider. . . . That's the only time. Every other time is offered only for intent, knowledge, stuff like that."

**DISCUSSION**

When the State introduces evidence of multiple distinct acts or incidents, any one of which would constitute the offense for which the defendant is on trial, the State must, upon request, elect the act or incident on which it will rely for conviction. *O'Neal v. State*, 746 S.W.2d 769, 771 (Tex. Crim. App. 1988). Although the trial court has the discretion to require an earlier election, a request for election made when the State rests its case in chief must be granted. *Phillips v. State*, 193 S.W.3d 904, 909 (Tex. Crim. App. 2006). An election serves four purposes: (1) it protects the accused from the introduction of extraneous offenses; (2) it minimizes the risk that the jury might choose to convict, not because any one crime was proved beyond a reasonable doubt, but because

7

all of the incidents convinced the jury that the defendant was guilty; (3) it ensures jury unanimity, that is, unanimous agreement that one specific incident occurred constituting the offense charged; and (4) it gives the defendant notice of the specific offense for which he is on trial and affords him an opportunity to defend. *Id*. at 909-10.

In his first issue, appellant asserts that the State's election to rely on the incident in which M.G. remembered saying, "I'm 14, you can't do this any more," was insufficiently specific. Appellant notes that M.G. never testified to making this specific statement.[2] Moreover, M.G. testified that the assaults were committed repeatedly starting when she was fourteen. Appellant contends that under the circumstances, the State's election did not give him adequate notice of the specific incident on which it was relying for conviction and or otherwise serve the purposes of an election. In his second issue, appellant contends that the trial court compounded the error by failing to instruct the jury on the State's election, thereby permitting the jury to convict him without agreement as to which specific incident constituted the offense.

The State responds to these contentions by conceding that "the election made at trial by the prosecuting attorney in this case was imprecise at best" and that the trial court erred by refusing to instruct the jury on the State's election. The State contends, however, that these errors were harmless under the circumstances of this case. The State relies on the recent opinion in *Dixon v. State*, 201 S.W.3d 731 (Tex. Crim. App. 2006).

_____

[2] During her direct testimony, M.G. said that she remembered once telling appellant, "I'm 14, you're sick, why are you doing this?" During cross-examination, M.G. recalled telling appellant, "I'm 14, what are you doing?" We infer that M.G. was referring to the same incident on both occasions.

8

*Dixon* was a prosecution for aggravated sexual assault of a child. *Id*. The complainant testified that every time the defendant assaulted her, he would undress himself, remove her underwear, and then touch her genitals with his hand and his penis. *Id*. at 732. She testified that this sequence of events happened one hundred times and, with one exception, always at night. *Id*. The complainant gave no further details regarding the assaults. *Id*. The trial court denied the defendant's request for an election by the State and his request that the jury charge reflect an election for one offense. *Id*. The court of criminal appeals agreed that the trial court had erred, but after considering the four purposes of the election rule, the court concluded that the trial court's failure to require an election was harmless beyond a reasonable doubt. *Id*. at 734-36; *see* Tex. R. App. P. 44.2(a).

The State contends that the circumstances shown by the record now before us are substantially identical to those in *Dixon* in all pertinent respects. The State asserts that, as in *Dixon*, the trial court's failure to require an election did not prejudice the interests that the election rule is designed to protect. We agree that under the analysis employed in *Dixon*, no reversible error is presented.

First, appellant was not entitled to be protected from the admission of evidence of extraneous sexual offenses committed by him against M.G. *See Dixon*, 201 S.W.3d at 734. These offenses were admissible to show appellant's state of mind and the relationship between appellant and M.G. *See* Tex. Code Crim. Proc. Ann. art. 38.37 (West Supp. 2008).

Second, there was no risk that the jury found appellant guilty of an offense that was not proven to its satisfaction beyond a reasonable doubt. *See Dixon*, 201 S.W.3d at 735. As in

9

*Dixon*, the present case did not involve different witnesses describing different activities that the jury might perceive as warranting a finding of guilt even though no single offense was proved beyond a reasonable doubt. Instead, all of the assaultive incidents were recounted by only one witness, M.G. Moreover, M.G.'s testimony did not describe varied incidents with differing details. She instead described a consistent pattern of conduct repeated fifty times with no significant variation. The number of times the sequence of events she described was repeated did not in itself add credibility to her story.

Third, there was no risk of a non-unanimous verdict. *See id*. M.G. testified that appellant's conduct over the course of several years was consistent: he would remove their clothing, touch her breasts, penetrate her vagina with his fingers, place his mouth on her vagina, and place his penis in her mouth. M.G. testified that the location of the assaults varied between the bedroom, the living room, and the workshop, but there was nothing shown to be distinctive about the acts committed by appellant in any one of these places. M.G. was able to precisely date one of the assaults—the last one, on June 11, 2006—but there was no evidence that it differed in any material respect from the others.[3] Appellant sought to cast doubt on whether this last assault took place, but only as a way to cast doubt on the entirety of M.G.'s testimony. There is nothing in the record to suggest that the jurors, while able to agree that appellant sexually assaulted M.G. by penetrating her with his finger, might have been unable to agree as to any single date on which this act occurred.

---

[3] M.G.'s ability to give a specific date for one of the assaults distinguishes this case from *Dixon*, in which the complaining witness was unable to date any of the assaults. *See Dixon v. State*, 201 S.W.3d 731, 732 (Tex. Crim. App. 2006). Appellant does not contend, however, that the State should have been required to elect the June 11 incident to the exclusion of any of the others testified to by M.G.

Fourth, appellant was not deprived of adequate notice. *See id*. at 736. According to M.G.'s testimony, the fifty assaultive incidents were essentially identical. Appellant, in effect, denied committing any of the alleged acts and asserted that he had been falsely accused. There is no basis for concluding that appellant would have been better able to put forward his defense had the State been required to elect a single assaultive incident.

Finally, we note that during their arguments, both the prosecutor and defense counsel told the jurors that they were to consider only the incident in which M.G. said "I'm 14, you can't do that any more" in determining whether appellant was guilty. It is likely that the jury understood this to be a reference to the incident twice described by M.G. in which she made a statement to that effect. *See* fn. 2, *supra*. Although we do not hold that jury argument is an acceptable substitute for a proper jury charge, these statements by both parties did serve to bring the State's election, such as it was, to the jury's attention.

For the reasons stated, we hold that the trial court's failure to require a proper election by the State was harmless beyond a reasonable doubt. *See* Tex. R. App. P. 44.2(a). The issues are overruled, and the judgment of conviction is affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: December 5, 2008

Do Not Publish

11